# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JEAN B. GERMAIN,

    Plaintiff,

    v.

WARDEN FRANK BISHOP, JR.,
BRUCE A. LILLER, *Chief of Psychology*,
WILLIAM BEEMAN,[1]
*Assistant Director of Nursing*,
JANETTE CLARK,
KRISTA BILAK, and
WEXFORD HEALTH SOURCES, INC.,

    Defendants.

Civil Action No. TDC-15-1421

## MEMORANDUM OPINION

Plaintiff Jean Germain, currently incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, has filed suit under 42 U.S.C. § 1983 against Defendants Frank B. Bishop, Jr., Warden of NBCI; Bruce A. Liller, the NBCI Mental Health Program Manager; William Beeman, R.N., the NBCI Assistant Director of Nursing; Janette Clark, a Nurse Practitioner ("N.P. Clark") at NBCI; Krista Bilak, a Registered Nurse Practitioner ("R.N.P. Bilak") at NBCI; and Wexford Health Sources, Inc. ("Wexford"), NBCI's contracted medical services provider. Germain alleges that Defendants: (1) have exhibited deliberate indifference to both his medical and psychological needs; (2) have implemented a policy on handcuffing inmates that exacerbates his chronic shoulder condition; (3) have imposed sanctions

---

[1]   Germain originally filed suit against "William Beaman, Director of Nursing." Compl. at 1, ECF No. 1. According to Defendants, the correct spelling is "William Beeman," and his correct title is "Assistant Director of Nursing." Med. Defs.' Mot. Dismiss, ECF No. 35. The Clerk is directed to amend the docket to reflect Defendant Beeman's correct name and title.

against him without due process of law resulting in unconstitutional conditions of confinement; and (4) have retaliated against him for engaging in constitutionally protected activity by denying him access to medical care and depriving him of free multivitamins and skin lotion. Germain also alleges that he was assaulted by Correctional Officer ("C.O.") Nicholas Soltas, who was not named as a defendant, and seeks to amend the Complaint to add claims and join defendants relating to that alleged assault.

Presently pending before the Court are a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment filed by Defendants Wexford, Beeman, Clark, and Bilak (collectively, "the Medical Defendants"); a Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment filed by Defendants Bishop and Liller (collectively, "the Correctional Defendants"); a Motion for an Order Compelling Discovery and Motion to Join Claims filed by Germain; the Medical Defendants' Motion to Strike various filings by Germain; and the Medical Defendants' Motions for Sanctions under Federal Rule of Civil Procedure 11. No hearing is necessary to resolve these motions. *See* D. Md. Local R. 105.6.

For the reasons set forth below, the Medical Defendants' Motion to Dismiss or for Summary Judgment will be granted in part and denied in part; the Correctional Defendants' Motion to Dismiss or for Summary Judgment will be granted; Germain's Motion to Compel and to Join Claims will be granted in part to the extent that Germain's proposed amended complaint will be construed as a new complaint and otherwise denied; the Medical Defendants' Motion to Strike will be granted; and the Medical Defendants' Motions for Sanctions will be denied.

**BACKGROUND**

**I.      Conditions of Confinement**

On March 3, 2015, Germain refused to accept a cellmate into his cell and violated prison rules by placing his arm through the security slot in his cell and refusing to remove it when told to do so.  The next day, March 4, 2015, Germain refused to be handcuffed by correctional officers through the security slot, grabbed the arm of one officer, and was then pepper-sprayed by the guards.  When he refused to submit to handcuffing, correctional officers entered the cell and handcuffed him.  Germain also alleges that Soltas and other correctional officers attacked him and pepper-sprayed his rectal area, in violation of the Prison Rape Elimination Act.

On March 10, 2015, Germain appeared at two formal prison hearings relating to rule violations arising from the March 3 and March 4 incidents.  After Germain testified in his own defense before each panel, he was sentenced to 365 days of disciplinary segregation and an indefinite loss of visitation rights on the March 4, 2015 incident and 200 days of segregation on the March 3, 2015 incident.  After these sentences were imposed, the NBCI Reduction in Violence Committee recommended that Germain receive an additional 90 days of cell restriction, concurrent to the other sentences.  On April 2, 2015, the NBCI Chief of Security, on behalf of the Warden, accepted the Committee's recommendation.  Germain filed an appeal, which was denied by the Chief of Security, again on behalf of the Warden, on April 6, 2015.  The cell restriction began that same day.

According to Germain, he was sentenced to 870 days of disciplinary segregation at NBCI, during which he was limited to two showers and five hours of exercise time per week. With the cell restriction in place, Germain was limited to only one hour of outdoor exercise per week.

3

## II.     Mental Health Care

According to Germain, he is currently being treated by the NBCI Psychology Department for post-traumatic stress disorder ("PTSD"), chronic depression, and anxiety disorder. Following the March 3, 2015 and March 4, 2015 incidents, Germain conducted a hunger strike. During medical examinations on March 7, 2015 and March 11, 2015 in response to his hunger strike, doctors referred Germain for a mental health evaluation. Up to that point, Germain had been receiving some form of psychiatric medication. On March 13, 2015, he met with Norma Holwager, a member of the Psychology Department. Germain asserts that a correctional officer interrupted the meeting, and that Holwager did not return the following Monday as promised and did not respond to requests and letters he sent to her.

Starting on March 16, 2015, Germain submitted a series of sick call requests in which he reported hearing voices, having anxiety attacks, and nightmares. According to Germain, he has been re-living the March 4, 2015 assault both while awake and in nightmares, he has had anxiety attacks as a result of that incident, and he "cannot quiet" voices he has been hearing. Comp. Ex. 1 at 5, ECF No. 1-1. On April 19, 2015, Germain began another hunger strike. When he was seen by Dr. Mahboob Ashraf on April 21, 2015 in response to the second hunger strike, Dr. Ashraf told Germain that he would request that Liller, the NBCI Mental Health Program Manager, arrange for Germain to receive mental health services. The following day, on April 22, 2015, Germain was seen by Psychology Associate Laura Beitzel, but she did not follow up with him after that visit. The record does not reflect that Germain received any other mental health care or treatment prior to the filing of his Complaint in this case in May 2015, other than preexisting orders for medication. By November 2015, however, he had been prescribed various psychiatric medications, including Doxepin, Vistaril, and Zoloft.

4

During March and April 2015, Germain wrote to Liller to request that his mental health needs be addressed and that he be transferred to the Special Needs Unit ("SNU"). Liller did not respond to Germain. Liller oversees psychological and psychiatric treatment for inmates, including the provision of psychiatric medications. Inmates with serious mental illnesses are housed in the SNU. According to the SNU Program Manual, inmates referred and admitted to the SNU have a "severe" mental health diagnosis pursuant to the Diagnostic and Statistical Manual of Mental Disorders IV ("DSM IV"), such that their "ability to function is so impaired" that they "cannot be placed in General Population without special consideration." SNU Manual at 7, Correctional Defs.' Mot. Dismiss Ex. 4, ECF No. 70-5. The manual further provides that:

> Impairment to functioning in General Population includes but is not limited to the following criteria:
>
> (a) Inability to understand a direct order;
> (b) Responding to internal stimulation (hallucinations). These hallucinations either distract the inmate from following orders or are commanding the inmate to do something contrary to security procedures;
> (c) Inability to maintain personal hygiene and or clean his cell;
> (d) Vulnerable by nature of their mental illness;
> (e) Disruptive behavior (banging door, yelling, etc.);
> (f) Any aggressive behavior as a response to the mental illness;
> (g) Disrespectful for threatening verbalizations;
> (h) Severe vulnerability to other inmates; and
> (i) Diminished capacity through cognitive deficit or misinterpretation of stimuli.

*Id.*. According to Liller, Germain does not exhibit any of the above symptoms and therefore has not been referred to the SNU.

## III. Medical Care

Germain has suffered from a variety of physical ailments, including athlete's foot, dry skin, and vitamin deficiency associated with his periodic hunger strikes. As early as January 2014, Germain received "Lubri-skin" lotion as part of his medical treatment for dry skin. Med.

Records at 6, Med. Defs.' Mot. Dismiss Ex. 1, ECF No. 35-4. He also began receiving multivitamins on March 9, 2015 following a hunger strike in protest of the March 3 and 4, 2015 incidents in his cell. However, N.P. Clark discontinued these prescriptions on April 8, 2015 when she determined that they were no longer necessary.

Germain also suffers from chronic shoulder pain caused by degenerative spondylosis that affects his cervical spine. Germain has received pain medication for this condition including, at various times, Mobic, Neurontin, and Tramadol. On October 19, 2016, Dr. Ashraf prescribed to Germain a 90-day supply of Tramadol for his shoulder pain. This prescription was renewed on December 14, 2016 by R.N.P. Bilak, who extended the prescription to April 14, 2017. At the same time, Dr. Ashraf entered a duplicate prescription to expire on February 14, 2017. Then, on February 13, 2017, Germain was given a four-day Tramadol prescription to accommodate him during a temporary transfer to another institution for a medical consultation. When he returned, his long term prescription was inadvertently superseded by the four-day prescription, such that his prescription stopped as of February 18, 2017. According to Germain, he began to experience symptoms consistent with opiate withdrawal. After submitting sick call requests, Germain was seen by a nurse on February 28, 2017, who observed that Germain had "no real issues at time of sick call" but referred him for pain management. Med. Records at 113. On March 8, 2017, a pharmacist reviewed his case and recommended that his Tramadol prescription be re-started. Germain refused to attend medical visits on March 8, 2017 and April 22, 2017, at which the renewal could have taken place.

Overall, Germain's medical records show that he was seen by medical personnel over 50 times from August 10, 2013 to March 8, 2017. These visits have included receiving pain

medication, undergoing diagnostic scans, and traveling to another facility for examination by a neurosurgeon.

## IV.    Handcuffing

According to Germain, because of his chronic shoulder pain, he received an order from NBCI medical staff requiring that he "be cuffed using a special pair of handcuffs with a longer chain to alleviate his shoulder pain." Compl. ¶ 10, ECF No. 1. No copy of this order is in the record, and it is not clear when it was issued. In Fall 2013, the Warden of NBCI issued an order that gave authority to determine handcuffing procedures to correctional officers, not medical staff. No copy of this policy is in the record.

According to Germain, he was originally granted "front cuffing status" by medical personnel, which was later modified, at the request of NBCI correctional officers, to handcuffing behind his back using a longer-than-usual chain. Mot. Amend. ¶¶ 3-4, ECF No. 20. This order was subsequently rescinded "at the request of custody staffs claiming security reasons," but without providing a specific security justification. *Id.* ¶¶ 5-6. Soon after, Germain began to experience significant pain throughout his body, beginning in his neck but spreading throughout his body. Germain was examined by NBCI medical personnel and eventually underwent a magnetic resonance imaging ("MRI") and consultation with a neurosurgeon, who recommended that Germain continue to receive physical therapy and pain medication.

On May 26, 2015, Germain told the correctional officers assigned to escort him to another facility, Officers Dorcon and Gilpin, that he had a medical order stating that he had "doublecuff only status." Supp. Compl.¶ 3 at 4, ECF No. 7. The officers ignored his claim and sought to handcuff him behind the back using a standard length chain. One of the officers cursed at Germain.

## V.     ARPs

Germain has filed a number of complaints under the prison's Administrative Remedy Procedure, known as "ARPs."  On April 14, 2015, Germain submitted an ARP complaining about the response time to his more than 30 sick call requests and N.P. Clark's failure to provide him with adequate pain medication.  According to Germain, on April 23, 2015 and April 30, 2015, he withdrew certain ARPs because Beeman threatened to prevent Germain from seeing any medical providers if he did not withdraw them.  On May 8, 2015, he submitted an ARP again complaining about the responsiveness of the medical staff.  Then, on May 14, 2015, Germain submitted an ARP stating that Beeman had asked him that day to withdraw his prior ARP, under threat that Beeman would deny him permission to see a medical provider.  Germain refused to do so.

## DISCUSSION

In their Motions, the Medical Defendants and Correctional Defendants seek dismissal of all claims under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, summary judgment under Rule 56.  In response to the Motions, Germain has filed not memoranda of law in opposition to the Motions, but individu

al affidavits seeking discovery.  Germain has also filed  a series of freestanding affidavits, many of which seek discovery, which has prompted the Medical Defendants to file a Motion to Strike and two Motions for Sanctions.  Because the question of whether discovery is necessary affects whether the Court may construe the Motions as motions for summary judgment, the Court will first address the affidavits requesting discovery and the related motions.

## I.    Motions to Strike and for Sanctions

In response to the Medical Defendants' Motion, Germain filed a document captioned as an Affidavit requesting various materials in discovery. Following the Correctional Defendants' Motion, Germain filed another document captioned as an Affidavit requesting materials. The Court will consider these filings to be Germain's memoranda in response to the Motions. Germain has also filed a Motion for an Order Compelling Discovery and Motion to Join Claims, which is construed as a Motion to Amend the Complaint. That motion will be discussed separately. *See infra* Part III.

Germain has filed additional affidavits that are entirely duplicative of other filings or request discovery prematurely. The Medical Defendants have filed a Motion to Strike these extraneous affidavits. The Court will grant the Motion to Strike. ECF Nos. 78, 79, and 82 are duplicates of other filings and will be stricken. ECF No. 80, untethered to any motion, seeks to "expand Discovery." If construed as an additional filing relevant to Defendants' Motions, it is an unauthorized surreply filing. *See* D. Md. Local R. 105.2(a) ("Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed."). If construed as an independent motion for discovery, it is untimely. Discovery does not commence unless or until the Court issues a scheduling order, which would typically occur after any Rule 12 motions are resolved. *See* D. Md. Local R. 104.4. Accordingly, ECF No. 80 will also be stricken. Germain may renew any discovery requests contained in the affidavits once discovery begins, through a formal discovery request that complies with the Federal Rules of Civil Procedure. Because Germain is self-represented and likely does not fully understand the rules governing court filings, the Medical Defendants' Motions for Sanctions will be denied. The Court cautions Germain that

duplicate filings are improper and unnecessary, and that all filings must either be in the form of a motion or response to a motion.

## II.     Motions for Summary Judgment

Both the Medical Defendants and the Correctional Defendants have attached exhibits to their Motions.  If the Court considers such materials, it must construe the Motions as seeking summary judgment under Rule 56.  Fed. R. Civ. P. 12(d).

### A.     Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A verified complaint, however, is the equivalent of an affidavit for summary judgment purposes, when the allegations contained in the complaint are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); *Davis v. Zahradnick*, 600 F.2d 458, 459–60 (4th Cir.1979).  Here, the verified Complaint, which describes the alleged constitutional violations, is based upon Germain's personal knowledge, and Germain has affirmed that his

allegations are stated under penalty of perjury. Accordingly, the Court will construe the verified Complaint as an affidavit for purposes of determining whether it generates a genuine dispute of material fact for the claims asserted.

### B.    Rule 56(d) Affidavits

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise the issue that discovery is needed, the non-moving party typically must file an affidavit or declaration pursuant to Rule 56(d), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition" without discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing the affidavit requirement of Rule 56(f), the predecessor to Rule 56(d)). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see also Gardner v. United States*, 184 F. Supp. 3d 175, 182-84 (D. Md. 2016) (denying a request for pre-summary judgment discovery where the requested discovery would not support a claim of deliberate indifference by medical providers).

In response to the Medical Defendants' Motion, Germain filed an affidavit stating that he requires discovery in order to respond properly to the Motion. Specifically, Germain sought a

copy of the 2013 NBCI handcuffing policy, the investigative summary of an ARP against N.P. Clark purportedly relevant to his claim that she retaliated against him, and records relating to the Tramadol prescription. On June 1, 2017, the Court granted Germain the right to access his medical records, which would include those relating to Tramadol, so that he could review them and obtain copies of relevant records. The Court deferred a decision on Germain's access to the handcuffing policy and ARP history until the Correctional Defendants filed their Motion to Dismiss. Pursuant to that Order, the Medical Defendants made the medical records available to Germain for his review. Although Germain later complained that he was not actually given access to his full records, the Medical Defendants have established that a Wexford representative attempted to deliver the records to Germain in his cell, but he refused to sign a receipt for the records. Where Germain was given access to his medical records yet refused to accept them, he cannot now claim that he has been denied discovery of these records. In any event, the medical records were submitted to the Court and are now part of the record.

In response to the Correctional Defendants' Motion, Germain requested additional discovery that he claims is necessary to oppose both Motions. He renewed his request for (1) the 2013 handcuffing policy and (2) the investigative summary of the ARP about N.P. Clark. He asserted that he needed discovery relating to his claim that his Tramadol prescription was improperly discontinued, including (3) "a copy of the pass list and segregation confinement sheet" for March 8, 2017 to refute the allegation that Germain refused to see medical personnel that day, Germain Aff. ¶ 3, ECF No. 77; (4) a deposition of a nurse to show that R.N.P. Bilak ordered the discontinuation of his Tramadol prescription; and (5) a medical expert to refute the claim that he had not suffered narcotics withdrawal. The pass list has since been produced by Defendants, as an exhibit to the Motion to Strike. Germain also requested (6) his mental health

records on the issue whether Liller was deliberately indifferent to his need for mental health treatment; and (7) records of the investigation of the alleged assault on March 4, 2015. Since Germain has stated that he "cannot present facts essential to justify [his] opposition" without discovery, *Id.* ¶ 1, the Court will treat his affidavit as a Rule 56(d) affidavit and will address whether each discovery request has merit, and thus warrants denial of the motion for summary judgment as premature, within the discussion of the legal argument to which it relates.

### C. Medical Needs

Germain alleges that Defendants were deliberately indifferent to his physical and mental health in violation of his Eight Amendment rights. Specifically, Germain alleges that: (1) Liller ignored his requests for mental health treatment that he needed in the aftermath of the alleged assault on Germain; (2) based on his mental health condition, Germain should have been transferred to the SNU; (3) N.P. Clark denied him multivitamins and lotion contrary to an earlier order by a doctor; and (4) R.N.P. Bilak stopped Germain's prescription for Tramadol, causing Germain to undergo withdrawal symptoms.

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle* v. *Gamble,* 429 U.S. 97, 104 (1976); *Jackson* v. *Lightsey,* 775 F.3d 170, 178 (4th Cir. 2014). To be "serious," the condition must be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson,* 775 F.3d at 178 (quoting *Iko* v. *Shreve,* 535 F.3d 225, 241 (4th Cir. 2008)); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (holding that the need to provide insulin to an inmate with insulin-dependent diabetes, where the physician acknowledged it was required, is an

objectively serious medical need). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). Thus, a deliberate indifference claim has both an objective component—that there objectively exists a serious medical condition and an excessive risk to the inmate's health and safety, and a subjective component—that the official subjectively knew of the condition and risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1978) (holding that an official must have "knowledge" of a risk of harm, which must be "objectively, sufficiently serious").

Deliberate indifference is an "exacting standard" that requires more than a showing of "mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson,* 775 F.3d at 178; *Rich* v. *Bruce,* 129 F.3d 336, 339 (4th Cir. 1997) (finding that even when prison authorities are "too stupid" to realize the excessive risk their actions cause, there is no deliberate indifference). To constitute deliberate indifference to a serious medical need, the defendant's actions "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier* v. *Beorn,* 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. "Questions of medical judgment are not subject to judicial review." *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). The right to treatment is "limited to that which may be provided upon a reasonable

cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring* v. *Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977).

### 1. Mental Health Treatment

The Correctional Defendants argue that Germain has had, and continues to have, access to psychological care, such that Liller has not acted with "deliberate indifference" to his serious medical needs. There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring*, 551 F.2d at 47. A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id*.

Germain's medical records show that he was referred to a psychiatric, mental health, or behavioral health provider in 2012, twice in 2014, and several times in the aftermath of the March 4, 2015 incident: on March 7, 2015, March 15, 2015, and April 21, 2015. Germain acknowledges that he was seen by a member of the NBCI psychology staff on March 13, 2015 but asserts that the session was cut short by a correctional officer and that he was unable to secure a follow-up session for a month. He contends that starting on March 16, 2015, he submitted a series of sick call requests in which he reported hearing voices, having anxiety attacks, and nightmares associated with the March 4, 2015 incident, but there was no response. It was only after he began another hunger strike that he was referred again. On April 22, 2015, Germain was seen by Psychology Associate Laura Beitzel, but she did not follow up with him after that visit. According to Germain, during March and April 2015, he wrote to Liller about his

"difficulties" and requested treatment and an assignment to the Special Needs Unit. Germain Decl. ¶¶ 8, 12, ECF No. 1. Liller did not respond.

The Court construes Germain's deliberate indifference claim regarding mental health treatment as having two related but separate components. The first is that NBCI mental healthcare providers failed to give him adequate treatment during the period after the March 4, 2015 incident when he was experiencing serious symptoms, such as hearing voices and having anxiety attacks, yet could not get an appointment with a provider without going on a hunger strike and received no known additional treatment after April 2015. Such allegations are sufficient, at a minimum, to state a claim for deliberate indifference to an inmate's mental health needs. *See DePaola v. Clarke*, __ F.3d __, No. 16-7360, 2018 WL 1219611, at *2 (4th Cir. Mar. 9, 2018) (finding that an inmate stated a deliberate indifference claim when he alleged that he had "never received any mental health treatment while at [the prison], including being allowed to speak to an institutional psychiatrist or psychologist").

Although none of the medical records submitted by Wexford reference that he was suffering from extreme emotional distress, auditory or visual hallucinations, or other symptoms of mental health disorders during this time period, these records do not document the two mental health visits in March and April 2015. More generally, they do not address what mental health treatment he received and when, other than the inclusion of certain mental health medications on longer lists of medications prescribed to Germain. The mental health treatment records are apparently kept separately, by NBCI rather than Wexford, and have not been submitted.

Moreover, although Liller stated in his declaration that "psychological and psychiatric treatment are available to inmates at NBCI" and that "mental health professionals will assess the inmate and address his concerns" upon request, he did not state whether Germain's requests for

mental health treatment were timely and adequately resolved. Liller Decl. ¶ 2, Correctional Defs.' Mot. Dismiss Ex. 4, ECF No. 70-5. He did not deny that Germain sent letters requesting treatment; rather, he stated that it was not his job to respond to such requests, but that letters generally receive "appropriate responses." *Id.* ¶ 4. On this record, the Court lacks sufficient information upon which to adjudicate this issue. Without records documenting Germain's mental health treatment, Germain cannot argue, and the Court cannot evaluate, whether there was deliberate indifference to serious mental health needs during that time period. The Court therefore agrees with Germain's Rule 56(d) request for production of Germain's mental health records. The Motion for Summary Judgment will be denied without prejudice on this issue as premature, and the Correctional Defendants will be ordered to provide Germain with access to his mental health records and to submit the mental health records to the Court with any future motion on this issue.

The second deliberate indifference claim relates to Germain's assertion that he should have been transferred to the SNU. In his declaration, Liller stated that he has "reviewed Mr. Germain's mental health records and concluded that Germain "is not housed in the SNU because he did and does not suffer from a serious mental illness that warrants such a placement and he did and does not meet the criteria for such a placement." Liller Decl. ¶ 3. *See also* SNU Manual at 7, Correctional Defs.' Mot. Dismiss Ex. 4, ECF No. 70-5 (detailing criteria for admission to the SNU). Although the specific mental health records have not been provided, on this issue the Court notes that where Germain has self-reported his mental health conditions as "PTSD, chronic depression, and anxiety disorder," Compl. ¶ 8, and he has not claimed to have conditions matching the criteria listed in the manual for placement in the SNU, the Court need not review the mental health records to resolve this claim. To the extent that Germain maintains that he

should be transferred to the SNU, he has at most presented a disagreement with mental health professionals on the type and amount of mental health treatment needed, which is not sufficient to establish a claim for deliberate indifference to a serious medical need. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (holding that "disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged"). Accordingly, Germain's additional request for the medical records of inmates in the SNU in order to show, by comparison, that he should be assigned, is not necessary to resolve this claim and will be denied.

### 2.    Multivitamins and Lotion

The Medical Defendants argue that they are entitled to summary judgment on Germain's claim that N.P. Clark was deliberately indifferent to his serious medical needs by discontinuing his medical orders for multivitamins and skin lotion. Objectively, dry skin, the condition to be addressed by "lubri-skin lotion," is not a serious medical need, such that the failure to provide treatment for it does not amount to an Eighth Amendment violation. *See, e.g., Witherspoon v. Africa*, No. JFM-10-1832, 2010 WL 4183508, *2 (D. Md. Oct. 25, 2010). Even if dry skin were deemed to be a serious medical condition, the medical records reveal that on July 17, 2015, N.P. Clark diagnosed Germain as having athlete's foot, which necessitated the discontinuation of the use of the skin lotion. Such a medical judgment will not be deemed to violate the Eighth Amendment. *Russell*, 528 F.2d at 319. Likewise, Germain's claim that he was denied multivitamins does not establish an objectively serious medical condition. *See, e.g., Long v. Bryant*, No. 07-cv-3881-GRA, 2008 WL 3010089, at *10 (D.S.C. July 31, 2008). Further, the medical records reflect that Germain's multivitamin order was renewed and he was put on a high calorie diet on March 9, 2015, following his self-imposed hunger strike. On April 8, 2015, N.P.

Clark determined, as a matter of medical judgment, that the multivitamins and special diet were no longer necessary. *See Russell*, 528 F.2d at 319. Therefore, Germain's alleged denial of multivitamins and skin lotion does not establish a deliberate indifference claim. The Medical Defendants are entitled to summary judgment on this claim.

### 3. Pain Management

Finally, Germain claims that R.N.P. Bilak was deliberately indifferent to his serious medical needs when as of February 16, 2017, she discontinued his prescription for Tramadol, a pain medication originally prescribed for his chronic shoulder pain, which caused him to undergo withdrawal symptoms including shaking, chills, nausea, diarrhea, anxiety, and body pain, as well as generalized respiratory problems, dry gums, stomach cramps, and weight loss. The Medical Defendants do not dispute that Germain's Tramadol prescription was discontinued, but argue that it was inadvertent, challenge whether Germain underwent any significant withdrawal symptoms, and argue that this episode does not establish a claim for deliberate indifference.

Although Germain alleges that R.N.P. Bilak was responsible for discontinuing Germain's Tramadol prescription, the medical records establish that on December 14, 2016 at 9:39 a.m., R.N.P. Bilak renewed the Tramadol prescription for a period of 120 days, up to and including April 14, 2017. Both R.N.P. Bilak's December 14, 2016 medical report and a December 14, 2016 Non-Formulary Drug Request Form show a Tramadol prescription ending on April 14, 2017. The records further reveal that any issue with Germain's Tramadol prescription can be traced back to Dr. Ashraf, who submitted another Drug Request Form at 10:11 a.m. on December 14, 2016, 30 minutes after R.N.P. Bilak's prescription, requesting a 90-day renewal, but with a stop date entered as February 14, 2017. Compounding the errors is the fact that, as acknowledged by the Medical Defendants, a four-day prescription for Tramadol to support

Germain during a temporary transfer to another institution for a medical consultation was erroneously substituted for the permanent prescription. The records therefore firmly establish that R.N.P. Bilak was not responsible for, and apparently not aware of, the termination of Germain's Tramadol prescription in February 2017. There is no allegation, or evidence to suggest, that Dr. Ashraf sought to ignore a substantial medical need by entering a shorter prescription period, and the February cutoff date, which does not correspond to a 90-day period, is plainly a clerical error. Nor is there any evidence that the substitution of the four-day prescription was anything other than an error. Even if R.N.P. Clark or Dr. Ashraf should have noticed the discrepancy, the termination of the prescription cannot reasonably be deemed to constitute deliberate indifference by R.N.P. Clark or other medical personal. *See Jackson*, 775 F.3d at 178 (holding that the defendant must have actual, subjective knowledge of the risk to inmate health and safety in order to support a deliberate indifference claim).

Germain also alleges that medical personnel were not responsive to multiple sick call requests he submitted when he began to experience withdrawal symptoms. The record includes two sick call requests, on February 25 and 26, 2017, in which Germain complains of "excruciating pain" throughout his body, nausea, diarrhea, sweating, shaking, dry gum, vertigo, stomach pain, and cramping. Med. Records at 164-65. Germain also alleges that he submitted a sick call slip on February 22, 2017, complaining of substantially similar symptoms. However, the record shows that Germain was not ignored during this period, but saw a medical professional on February 20, 2017, before his symptoms began, and February 28, 2017, the day after his sick call slips were received. The nurse who examined Germain on February 28, 2017 acknowledged that Germain was reporting symptoms he attributed to the stoppage of his pain medication. Although she noted that Germain was "having no real issues at time of sick call,"

she referred Germain for pain management.  Med. Records at 113.  Then on March 8, 2017, the clinical pharmacist reviewed Germain's condition and recommended that his Tramadol prescription be re-started.  Germain refused available sick call visits on March 8, 2017 and April 22, 2017 before the prescription was eventually re-started.  Where medical personnel responded to Germain's sick call requests within a reasonable time frame, Germain has not established a deliberate indifference to a serious medical need.  Even if the Medical Defendants should have renewed the Tramadol prescription earlier, or were slow or ineffective in their response to Germain's symptoms, such acts or omissions would not have established a deliberate indifference to a serious medical need.  *See Jackson*, 775 F.3d at 178 (stating that negligence and many acts or omissions that would constitute medical malpractice do not rise to the level of deliberate indifference absent actual knowledge of a substantial risk to inmate health that was deliberately disregarded).  Since the Court finds no deliberate indifference on the part of R.N.P. Bilak, there is no basis for Germain's claim of deliberate indifference based on Wexford's policies.

In reaching this conclusion based on the objective medical records showing that R.N.P. Bilak had, in fact, extended Germain's Tramadol prescription, the Court denies Germain's request for a deposition of another nurse as unnecessary to resolve the Motion.  Likewise, the Court has neither credited nor relied upon the Medical Defendants' assessment that Germain's later medical conditions, from the time period after he asserted a deliberate indifference claim relating to Tramadol, were inconsistent with withdrawal symptoms.  The Court accepts that Germain underwent withdrawal following the termination of his Tramadol prescription, but finds that the Medical Defendants did not act with deliberate indifference in causing the termination or responding to his sick call requests.  Accordingly, the Court denies the remaining discovery

requests on these issues, including for an expert witness review of the medical records. Finding no basis under Rule 56(d) to grant discovery before ruling on the Motion, the Court grants summary judgment to the Medical Defendants on this claim.

### D. Handcuffing Policy

Germain also asserts that Beeman has "recently implemented a policy as a favor to NBCI Officials that allow them to ignore" a medical order requiring Germain to be handcuffed using a longer than usual chain ("the double cuffing order"). Compl. ¶ 11. Germain asserts that the double cuffing order is necessary because standard handcuffing causes him significant pain due to his chronic shoulder condition. Germain contends that the adoption and implementation of the policy constitutes deliberate indifference to a serious medical need. Germain has described a particular incident on May 26, 2015, when two correctional officers, Officers Gilpin and Dorcon, sought to, but did not actually, violate the double cuffing order by handcuffing him with his hands behind his back using a standard length chain. Although Germain initially included these officers as defendants in this case, he later voluntarily dismissed his claims against them because "they were only following the orders of the Medical Defendants." Mot. Recons. at 2, ECF No. 28.

As an initial matter, the Court dismisses this claim against Beeman. Dr. Robustiano Barrera, the NBCI Medical Director, has stated in a declaration that Beeman, as Wexford's Assistant Director of Nursing, has no authority to institute a policy regarding handcuffing procedures, including giving correctional officers the authority to ignore medical orders. According to Dr. Barrera, the Warden of NBCI issued a new policy in 2013 under which handcuffing procedures would be determined by correctional officers, not medical staff. This assertion is consistent with findings in other cases in this District addressing NBCI's handcuffing

policy, which have found that handcuffing procedures are dictated solely by the Warden, not medical staff. *See Pevia v. Stouffer ("Pevia I")*, No. ELH-13-2905, 2015 WL 424717, at *2 (D. Md. Jan. 29, 2015); *Germain v. Arnold*, No. JFM-12-3240, 2013 WL 2635110, at *2 (D. Md. June 11, 2013). Where Beeman lacks the authority to issue the handcuffing policy contested by Germain, the Court will dismiss the claim against Beeman relating to that policy.

Construed liberally, however, Germain has also alleged a claim against the NBCI Warden for implementing a handcuffing policy that allows correctional officers to ignore medical orders. Although the double cuffing order is not in the record, Germain's medical records reveal that on January 4, 2014, a doctor requested, "Please do extended cuffing in the back for one year." Med. Records at 4. Germain also alleges that NBCI eventually rescinded the double cuffing order and began handcuffing him in the standard fashion, resulting in severe neck pain, an MRI that revealed a herniated disc, and a neurosurgery consultation. Germain has therefore stated a claim against the Warden for deliberate indifference to a serious medical need by adopting a handcuffing policy that allows correctional officers to override medical orders. *See Howard v. Dickerson*, 34 F.3d 978, 981 (10th Cir. 1994) (upholding the district court's denial of a qualified immunity defense by officers who had handcuffed a suspect in the back, despite obvious indications of a neck injury that would be exacerbated by handcuffing procedure).[2]

Notably, Germain has previously challenged the application of the handcuffing policy at NBCI. In *Germain v. Arnold*, No. JFM-12-3240, 2013 WL 2635110, (D. Md. June 11, 2013), Germain brought suit against various NBCI personnel, including the Warden and Chief of Security, when he was handcuffed behind his back in apparent violation of a medical order on

---

[2]    Although the Correctional Defendants have generally asserted qualified immunity, they have not provided specific argument as to this issue. Qualified immunity is more appropriately addressed after all of the facts on this issue have been developed.

two occasions, once after Germain refused to show an officer his medical order, and a second time after the Chief of Security implemented a policy requiring all inmates to be cuffed behind the back. *Id.* at *1-2. The Court (Motz, J.) granted summary judgment to the defendants because Germain failed to state that he was in any apparent distress on both occasions. *Id.* at *5. Judges in this District have found the implementation of NBCI handcuffing policies to be constitutional, but only after a consideration of the justification for the policy and the characteristics of the particular inmate's condition and history. *See Pevia I,* at *11-12; *Dirton v. Sawyer*, No. RDB-13-2209, 2014 WL 2547796, at *5 (D. Md. June 5, 2014). *But see Pevia v. Shearin ("Pevia II"),* No. ELH-13-3083, 2015 WL 790354, at *7 (D. Md. Feb. 23, 2015) (denying defendants' motion for summary judgment on a claim related to the NBCI handcuffing policy where the defendants failed to provide evidence on the applicability of the policy to prisoners in the general population such as the plaintiff).

Here, it appears that Germain's claim relates to the same policy referenced in *Germain I.* At this point, however, the Court cannot be certain that it is the same one. The policy was not submitted by any of the Defendants, and Germain has requested that it be produced in discovery before the Motion is resolved. It is also not clear whether the double cuffing order to which Germain refers was the same order or a different order than the one that applied in 2013, and whether his medical condition necessitating such an order is the same. Because the claim was primarily asserted against Beeman, the Correctional Defendants have not responded to this claim in their Motion.

Under these circumstances, the Court will grant Germain's request for discovery of the NBCI handcuffing policy. The Court will order the Correctional Defendants to produce to Germain both that policy and any double cuffing order relating to Germain that was in effect in

2015.  Once these materials have been produced, the Correctional Defendants shall file an Answer or a dispositive motion to Germain's handcuffing claim, construed as a claim against the Warden.

### E.    Conditions of Confinement

Germain also alleges that, as of May 18, 2015, he was serving 870 days of disciplinary segregation and was allowed only five hours of exercise and two showers per week.  He asserts that during a period of cell restriction, he was limited to only one hour of exercise per week and two 15-minute showers per week.  He also asserts that he was denied visitation indefinitely.  According to Germain, he "was afforded no due process" when these conditions were imposed.  Compl. ¶ 7.  He further alleges that this deprivation of exercise has "affected him negatively, mentally and physically."  *Id.* ¶ 9.  Although not specifically stated in these terms, the Court construes these allegations as asserting claims for a denial of procedural due process under the Fourteenth Amendment and unconstitutional conditions of confinement under the Eighth Amendment.

#### 1.    Due Process

Prisoners have a liberty interest under the Fourteenth Amendment in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  In *Sandin*, an inmate who was sentenced to 30 days of disciplinary segregation, served that time, then had the disciplinary decision overturned on appeal, filed a due process claim under 42 U.S.C. § 1983.  *Id.* at 476.  The Court held that the disciplinary segregation, which did not affect the duration of the prison sentence, did not present the type of deprivation that implicates a constitutional liberty interest giving rise to due process

rights. *Id.* at 486. Likewise, the United States Court of Appeals for the Fourth Circuit has held that inmates have no liberty interest in avoiding, and thus no due process claim stemming from, placement in administrative segregation. *Beverati v. Smith*, 120 F.3d 500, 502-04 (4th Cir. 1997) (rejecting a due process claim by inmates held in administrative segregation for six months after disciplinary charges were resolved). The Court so held even though the actual conditions in segregation were markedly "more burdensome than those imposed on the general prison population," because those conditions were "not so atypical" that they "imposed a significant hardship in relation to the ordinary incidents of prison life." *Id.* at 504 (noting the inmates' claims that segregation included vermin-infested cells, human waste in cells, leaking toilets, unbearable heat, less food, reduced access to clean clothes and linens, reduced out-of-cell time, no outdoor recreation time, and no educational or religious services).

The existence of harsh prison conditions, standing alone, is insufficient to establish a liberty interest that requires due process protections. *Prieto v. Clarke*, 780 F.3d 245, 250 (4th Cir. 2015). Rather, there must exist an interest in avoiding "erroneous placement" in the challenged confinement "under the state's classification regulations *combined with* . . . . harsh and atypical conditions" for due process protections to apply. *Id.* (citing *Wilkinson*, 545 U.S. at 224-25). A prisoner must show "(1) denial of an 'interest that can arise either from the Constitution itself or from state laws or policies' and that (2) 'this denial imposed on him an atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Id.* at 251 (quoting *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006)).

Here, Germain offers no evidence that the conditions of his segregation cell went beyond those in *Sandin* and *Beverati* such that they establish an "atypical and significant hardship." Sandin, 515 U.S. at 472**.** Germain's 90-day period of cell restriction, while lengthy, was for a

defined period and not the indefinite imposition of solitary confinement in *Wilkinson*.  *See* 545 U.S. at 224.  Germain also does not identify any Maryland law or policy that provides him with an expectation of avoiding these conditions imposed on his confinement.  *Prieto*, 780 F.3d at 252.  The Court therefore finds no due process violation arising from Germain's period in segregation and his conditions of confinement.

The Court also notes that, despite his allegations, the record reflects that Germain received significant process prior to the imposition of disciplinary segregation and cell restriction.  Germain was given advance notice of the charges that originally led to his 365-day segregation period and allowed to present evidence at a formal hearing before prison officials.  The hearing officer reviewed a video of the March 4, 2015 incident before imposing the sentence, and Germain was given the opportunity to appeal the decision.  When the additional 90-day cell restriction penalty was imposed, Germain was allowed to appeal that decision as well.  Thus, contrary to Germain's claim that he received "no process at all," Germain was given significant opportunity to contest his disciplinary segregation, thus reinforcing the Court's conclusion that Germain has failed to establish a due process claim based on his confinement.

### 2.     Eighth Amendment

The Eighth Amendment prohibits prison conditions that amount to the "wanton and unnecessary infliction of pain," that are "grossly disproportionate to the severity of the crime warranting imprisonment," or that "deprive inmates of the minimal civilized measure of life's necessities."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The length of a prisoner's period in segregation is one consideration among many and does not establish an Eighth Amendment violation by itself.  *See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 472 (4th Cir. 1999).  In some cases, courts have upheld periods of

segregation, with associated restrictions on recreation and access to prison services, which last for decades. *See Isby v. Brown*, 856 F.3d 508, 521-24 (7th Cir. 2017) (finding no Eighth Amendment violation for over 10 years of solitary confinement despite generalized statements that the conditions made prisoner feel angry and dehumanized); *Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 764 (10th Cir. 2014) (finding no Eighth Amendment violation for a 30-year period of solitary confinement, despite documented mental health issues arguably attributable to the confinement, for a prisoner with a history of violent behavior and escape attempts).

Germaine's claim appears to mirror the claims in *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464 (4th Cir. 1999). In *Five Percenters*, the Fourth Circuit considered the claims of inmates who had been subject to administrative segregation for three years and claimed that they had suffered "great stress" and "great emotional and physical suffering." *Id.* at 472. The Five Percenters were limited to five hours of exercise per week, but they did not allege that the prison had failed to provide them with basic necessities such as food, water, shelter, clothing, or medical care, and the court found that they received regular medical check-ups and mental health referrals. *Id.* at 471-72. Under these circumstances, the court found no Eighth Amendment violation. *Id.* at 472-73.

Likewise, Germain alleges that he has been on segregation for, at most, 870 days, or over two years and three months. He receives two showers per week. *See, e.g.*, *Davenport v. DeRobertis*, 844 F.2d 1310, 1316-17 (7th Cir. 1988) (holding that a limitation to weekly showers did not violate the Eighth Amendment). With the exception of the limited cell restriction period, he receives five hours of exercise per week, and he has not alleged a denial of food, shelter, clothing, or other human necessities. His medical records reveal that he has regularly received

medical attention over this period, and by his own admission, he has been receiving treatment for mental health conditions, including "for depression and anxiety." Compl. at 9. Germain also acknowledges that a psychiatric nurse conducts weekly rounds through the segregation unit to address mental health issues, even though he has criticized the responsiveness of one particular nurse in that role. Where the conditions alleged by Germain are comparable to, or less severe than, those in *Five Percenters*, they do not constitute a violation of the Eighth Amendment. *See Five Percenters*, 174 F.3d at 471-72.

Although Germain also asserts that segregation has "exacerbated my physical and mental conditions," Germain Decl. ¶ 20, ECF No. 1, such generalized claims of adverse mental health impact from segregation do not establish an Eighth Amendment violation. *See Five Percenters*, 174 F.3d at 472 (finding no Eighth Amendment violation even with claims that segregation caused "great emotional and physical suffering" and "great stress"); *Williams v. Branker*, 462 F. App'x 348, 253-54 (4th Cir. 2012) (finding that claims that segregation aggravated the plaintiff's mental illness did not establish an Eighth Amendment violation). Because Germain has not established an Eighth Amendment claim arising from his conditions of confinement, the Court will grant summary judgment to the Correctional Defendants on this claim.

F. **Retaliation**

Finally, Germain alleges that Beeman retaliated against him for filing administrative complaints by "instructing his department not to schedule [Germain] to see a provider so [Germain] could have his concern addressed." Supp. Compl. ¶ 2. Germain also alleges that N.P. Clark retaliated against him for filing a separate administrative complaint about her medical service by discontinuing his orders for multivitamins and lotion. The Medical Defendants argue that these claims are false and that they are entitled to summary judgment on both claims.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228-29 (2001). Accordingly, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 545 (4th Cir. 2017). *See also Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013) (finding that filing a prison grievance alleging excessive force is protected by the First Amendment); *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (same). Thus, Germain's filing of grievances against Beeman and N.P. Clark was protected activity under the First Amendment.

As for the requirement that the defendant took an action adversely affecting First Amendment rights, a plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter a person of ordinary firmness from the exercise of First

Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing may be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Id.* at 501.

Regarding the claim against Beeman, while the denial of access to medical care would be a sufficient deterrent, Germain has not established that Beeman or any other official actually denied him access to care. Although Germain asserts that he refused Beeman's demand on May 14, 2015 to withdraw his ARP, presumably the one filed on May 8, 2014, Germain has not identified any instance in which he requested but was denied access to a medical care provider during this time period. In fact, he had medical visits on May 21, 2015, only a week later, and two visits in June 2015.

Germain also alleges that Beeman had made similar threats earlier, on April 23 and April 30, 2015, and that he had acquiesced and withdrawn his ARPs. But he has offered no evidence, or even allegations, describing which ARPs he withdrew. The only ARPs known to have been filed in April 2015 were filed on April 14, 2015 and April 15, 2015. Both are marked as received by the NBCI ARP Coordinator, and there is no indication on the face of those documents that they were withdrawn. Indeed, Germain has alleged in this litigation that the April 14, 2015 ARP, which criticizes N.P. Clark, led to an investigation.

Moreover, the fact that he filed ARPs on May 8, 2014 and May 14, 2014, within two weeks after Beeman allegedly threatened to withhold medical care because he had filed ARPs, illustrates that Germain was not dissuaded from exercising his First Amendment rights. Finally,

Dr. Barrera, the NBCI Medical Director, has stated in a declaration that Beeman does not even have authority to restrict inmate access to medical care. Because Germain has not asserted a plausible claim that Beeman retaliated against him for filing ARPs, the Medical Defendants are entitled to summary judgment on this claim.

Germain's claim of retaliation against N.P. Clark is likewise without merit. Germain claimed that after he filed an ARP on April 14, 2015 complaining about allegedly inadequate treatment by N.P. Clark, she retaliated against him by refusing to honor a medical order for multivitamins and lotion. Germain further states that Clark falsely stated in medical records that she saw him on April 16, 2015 and that he no longer needed multivitamins or skin lotion. The claim regarding the lotion plainly fails because Clark determined that Germain no longer needed it during a February 16, 2016 medical visit, when she noted, "[Patient] can purchase his own lotion." Med. Records at 33. When the decision to discontinue supplying the lotion occurred before the ARP referenced by Germain, he cannot establish causation for his retaliation claim. Moreover, the lotion was deemed to be inappropriate because of Germain's athlete's foot.

As for the multivitamins, the records establish that N.P. Clark actually saw Germain on April 8, 2015, before Germain filed the ARP on April 14, and determined that the multivitamins were no longer medically necessary based on lab work performed in March 2015. Dr. Barrera has confirmed the soundness of that conclusion. Barrera Aff. ¶ 8, Med. Defs.' Mot. Dismiss Ex. 2, ECF No. 35-5. Further, because neither multivitamins nor skin lotion are prescription medications, those products were available for Germain to purchase from the commissary. The Court therefore finds that the discontinuation of the provision of non-prescription health care products that were otherwise available would not deter a person of ordinary firmness from exercising First Amendment rights. *See Constantine*, 411 F.3d at 500. For these reasons, the

Court concludes that discovery relating to the investigation of the April 2015 ARP is not necessary before resolving the Motion. The Medical Defendants are entitled to summary judgment in their favor on this claim.

## III.    Motion to Join Claims

In Germain's Motion to Join Claims, which the Court construes as another Motion to Amend the Complaint, he seeks to add new defendants to this case, specifically NBCI correctional officers Cody Gilpin, Keith Markle, Nicholas Soltas, Walter Iser, Jr., and Bradley Wilt. He seeks to assert the following causes of action against these new defendants: excessive force, failure to protect, and denial of medical care. These claims relate to the March 4, 2015 incident, in which Germain alleges that correctional officers attacked him and used pepper spray on his rectal area, which led to a Prison Rape Elimination Act claim filed by Germain.

Although the Court "should freely give leave" to amend "when justice so requires," Fed. R. Civ. P. 15(a)(2), leave to amend may be denied where the proposed amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile. *See Equal Rights Ctr. v. Niles Bolton Assoc*., 602 F.3d 597, 603 (4th Cir. 2010). A proposed amendment is prejudicial to the opposing party if it is belated and would change the nature of the litigation. *Id*. at 604; *see Deasy v. Hill*, 833 F.2d 38, 42 (4th Cir. 1987).

Here, Germain filed this motion on September 13, 2017, over two years after his original Complaint, after two other Amended Complaints, and after the Correctional Defendants filed a lengthy dispositive Motion. The new claims would bring this case back to the very beginning stage of litigation. The Court finds that as a matter of timing, the proposed amendment is prejudicial to Defendants. In particular, the new claims would change the nature of the litigation. Although the March 4, 2015 incident was referenced in the original Complaint, the causes of

action to date have centered on Germain's conditions of confinement and his medical and mental health treatment following that incident. With the exception of C.O. Gilpin, who was temporarily a defendant on an unrelated issue, none of the proposed new defendants were named in prior versions of the Complaint, and the proposed new claims centering on excessive force are fundamentally different from the previous claims. By grafting an entirely new set of defendants and claims onto this case, the Motion would prejudice the original Defendants because it would likely delay the disposition of the remaining claims, which otherwise would likely be resolved in the near future. Accordingly, the Court will deny the Motion to Join Claims.

The Court will, however, grant Germain's alternative request that the Motion to Join Claims be accepted as a new civil case, effective the date of the filing of that motion. The Clerk will be directed to open a new civil case, effective September 10, 2017, the date of filing of the Motion to Join Claims, ECF No. 75, with that Motion accepted as the operative Complaint. *See Houston v. Lack*, 487 U.S. 266, 276 (1988) (stating that the filing date for a prisoner's submission is the date of mailing).

Because the Court will open this matter as a new civil case, Germain's request for discovery of the records of the investigation into the March 4 2015 alleged assault will be denied without prejudice as premature. Any discovery on this issue will be properly propounded in the new case upon the issuance of a scheduling order. D. Md. Local R. 104.4.

## CONCLUSION

For the foregoing reasons, the Medical Defendants' Motion to Dismiss or for Summary Judgment is granted. The Correctional Defendants' Motion to Dismiss or for Summary Judgment is granted in part and denied in part, in that the Motion is denied without prejudice as to the claims that the Correctional Defendants were deliberately indifferent to Germain's mental

health needs and his need for double cuffing, and the Motion is granted as to all other claims. Germain's Motion for an Order Compelling Discovery and Motion to Join Claims is granted to the extent that the Court accepts the filing as a new civil case and denied as to the requested discovery. The Medical Defendants' Motion to Strike is granted in that ECF Nos. 78, 79, 80, and 82 are stricken. The Medical Defendants' Motions for Sanctions are denied.

The Correctional Defendants are ordered to provide Germain with access to the mental health records, the NBCI handcuffing policy, and any prior double cuffing orders relating to Germain within 30 days. An Answer or renewed dispositive motion on the remaining claims shall be filed within 60 days. No further amendments to the Complaint will be permitted in this case. A separate Order shall issue.

Date: March 22, 2018

THEODORE D. CHUANG
United States District Judge