# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JEAN GERMAIN,

    Plaintiff,

v.

WARDEN FRANK BISHOP, JR., and
BRUCE A. LILLER, *Chief of Psychology*,

    Defendants.

Civil Action No. TDC-15-1421

## MEMORANDUM OPINION

In its Memorandum Opinion and Order dated March 23, 2018, the Court granted in part and denied in part the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("First Motion for Summary Judgment") filed on behalf of Defendants Frank Bishop, Jr., Warden of North Branch Correctional Institution ("NBCI"), and Bruce A. Liller, Chief of Psychology at NBCI, and granted summary judgment in favor of Defendants William Beeman, R.N., the Assistant Director of Nursing at NBCI; Janette Clark, a Nurse Practitioner at NBCI; Krista Bilak, a Registered Nurse Practitioner at NBCI; and Wexford Health Sources, Inc., NBCI's contracted medical services provider. The claims remaining against Defendants Bishop and Liller ("Defendants") relate to Plaintiff Jean Germain's allegations that, following an alleged assault by correctional officers with a chemical agent, Germain was denied psychological services for serious mental health needs, and that he was not afforded special handcuffing procedures to accommodate his shoulder injury as required by a prior medical order. In its prior ruling, the Court directed Defendants to provide Germain with copies of his mental health treatment records, the handcuffing orders relating to Germain, and any applicable handcuffing policy.

Following the Court's decision, Germain filed a Motion to Alter or Amend the Judgment ("Motion to Alter or Amend"), which is opposed by the relevant Defendants. Defendants have now filed a renewed Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Second Motion for Summary Judgment"), attaching extensive portions of Germain's mental health treatment records, which they move to place under seal. After the Motion was fully briefed, Germain filed a Motion for Appointment of Counsel and a Motion for Leave to File a Surreply. For the reasons stated below, Germain's Motion to Alter or Amend will be denied, Defendants' Motion to Seal will be granted, Germain's Motion for Leave to File a Surreply will be granted, Germain's Motion for Appointment of Counsel will be denied, and Defendants' renewed Motion for Summary Judgment will be granted.

## BACKGROUND

The Court set forth the background facts of this case in its prior Memorandum Opinion on the First Motion for Summary Judgment and incorporates that discussion by reference. *Germain v. Bishop*, No. TDC-15-1421, 2018 WL 1453336, at *1-4 (D. Md. Mar. 23, 2018) ("*Germain I*"). The Court therefore summarizes only those facts necessary to resolve the remaining motions.

### I.     Mental Health Treatment

According to Germain, on March 4, 2015, he was attacked by correctional officers and pepper-sprayed, including in his rectal area. Germain, who was already receiving psychiatric medication, began a hunger strike. During medical examinations on March 7, 2015 and March 11, 2015 in response to his hunger strike, doctors referred Germain for a mental health evaluation. On March 13, 2015, Germain met with Norma Holwager, a member of the Psychology Department, but a correctional officer interrupted the meeting, and Holwager did not return the following Monday as promised and did not respond to requests and letters he sent to her. Starting on March

16, 2015, Germain submitted a series of sick call requests in which he reported hearing voices, having anxiety attacks, and having nightmares as he relived the March 4, 2015 assault.

Germain claims that Defendants failed to provide adequate psychological care following the March 4, 2015 incident and thus acted with deliberate indifference to a serious medical need, in violation of the Eighth Amendment to the United States Constitution. In denying the First Motion for Summary Judgment as to this claim, the Court concluded that it could not resolve the matter because Defendants had failed to submit Germain's mental health treatment records for the relevant time period. *Germain I*, 2018 WL 1453336, at *8.

According to the records now submitted by Defendants, Germain received mental health care and treatment on a regular basis between February 2015 and April 2018, including after the March 4, 2015 incident. Prior to that incident, Germain had experienced anxiety and depression that caused him to seek to avoid having a cellmate. As of February 26, 2015, when Germain's medications were reviewed during a visit with Dierdre Mull, a nurse practitioner, Germain was taking various medications for these conditions, including Zoloft, Perphenazine, and Doxepin.

Following the March 4 incident, after Germain had instituted a hunger strike, he was examined on March 7, 2015 by Dr. Colin Ottey, who requested a psychological consultation for Germain. Dr. Mahboob Ashraf made a similar request on March 11, 2015. Germain was then seen on March 13, 2015 by Holwager. After the visit was interrupted by a correctional officer, Germain wrote to Holwager on March 16, 2015 and March 18, 2015 asking to meet again. In the meantime, by March 16, 2015, Germain had ended his hunger strike.

In another letter to Holwager dated March 25, 2015, Germain stated that he had recently been sexually assaulted by a "prison guard" but was not receiving mental health treatment despite Dr. Ottey's referral. Mental Health Records at 14-16, ECF No. 99. After acknowledging that

3

Holwager had appeared genuinely concerned about his well-being, Germain expressed his disappointment that his meeting with Holwager had been interrupted and that Holwager had allowed security staff to move another inmate into his cell. Germain referenced the Prison Rape Elimination Act ("PREA"), stated he was "reliving" the March 4, 2015 assault, suffering daily anxiety attacks, and hearing voices. *Id.* According to Germain, Holwager did not respond. On March 24, 2015 and March 29, 2015, Germain submitted sick call requests reporting anxiety attacks and seeking treatment. In his March 29, 2015 request, he stated that his psychiatric medication was not working.

On April 9, 2015, Germain wrote a letter to Liller in which he stated that he had recently suffered a "very traumatic event" that worsened his anxiety disorder. Mental Health Records at 17, ECF No. 99. Germain requested to see Liller to be evaluated for placement in the Special Needs Unit ("SNU"). On April 19, 2015, Germain began another hunger strike. When he was seen by Dr. Ashraf on April 21, 2015 in response to the second hunger strike, Dr. Ashraf told Germain that he would request that Liller arrange for Germain to receive mental health services.

The following day, on April 22, 2015, Germain was seen by Laura Beitzel, a Licensed Graduate Professional Counselor. During that visit, Germain stated that he had been sexually assaulted and had personal belongings stolen. He stated that his psychiatric medications were not working, that he had unspecified pain, and that he had had an anxiety attack in the medical unit. However, Beitzel observed that Germain was alert, oriented, and cooperative, had good hygiene, reported satisfactory sleep and appetite, and denied any suicidal or homicidal ideations. The only symptom of anxiety he identified was an increased heart rate. Based on her observations, his prior diagnoses of anxiety and depressive disorder, and the medications already prescribed, Beitzel noted that Germain did not qualify as seriously mentally ill. When Beitzel checked with the social

4

worker assigned to Germain's housing unit, she was advised that Germain's PREA claim had been reported, investigated, and dropped due to lack of evidence.

On May 8, 2015, after Germain submitted a sick call request relating to his anxiety, he was seen by Mull. He again referenced the alleged sexual assault, stated that his medication was not working, and reported severe anxiety and constant worry. Having observed that Germain appeared very anxious and spoke rapidly, but showed no signs of psychosis, Mull increased Germain's Zoloft dosage, added another medication, Vistaril, for severe anxiety and agitation, and planned for a follow-up visit in four weeks.

On June 9, 2015, Beitzel met with Germain again because Germain was seeking a referral to the SNU. She noted that Germain appeared alert, oriented, and cooperative, but that he often rambled and required redirection. As during her last visit with Germain, she observed that Germain's hygiene, grooming, and sleep and eating patterns were satisfactory. She also noted that most of Germain's prior claims proved to be without merit and referenced his recent claim relating to an alleged assault by an officer with mace as an example. Based on Germain's history and her encounter with him on this occasion, Beitzel concluded that his current reported symptoms and request for placement in the SNU appeared to be a continuation of his desire to avoid being placed in a double cell.

On June 17, 2015, Germain was examined by Dr. Vincent Siracusano relating to his ongoing diagnosis of depression. Germain reported continuing anxiety but stated that he was not depressed. The doctor concluded that the prescribed medications had resulted in moderate improvement and recommended continuing with the same regimen. During a September 16, 2015 follow-up visit, Germain reported nightmares relating to his alleged abuse by officers. The doctor observed that Germain was not suicidal or depressed, concluded that he was doing "fairly well"

5

with the current medication, and did not alter his prescriptions. Mental Health Records at 54. On December 15, 2005, Germain had another visit with Dr. Siracusano, who again found that the medication had resulted in moderate improvement with depression. Beginning on November 23, 2015 and continuing through April 28, 2017, Germain attended group therapy sessions.

## II.    Handcuffing

Germain's second remaining claim is that he was not properly handcuffed by correctional officers, in contravention of a medical order requiring special handcuffing due to his shoulder and neck pain. According to Germain, because of his chronic shoulder pain, he received an order from NBCI medical staff requiring that he "be cuffed using a special pair of handcuffs with a longer chain to alleviate his shoulder pain," also referred to as "double cuffing." Compl. ¶ 10, ECF No. 1. Germain alleged that this order was later rescinded "at the request of custody staffs claiming security reasons," but without providing a specific security justification. Mot. Amend. ¶¶ 5-6, ECF No. 20. Germain recounted a specific incident, on May 26, 2015, when although Germain told the correctional officers assigned to escort him to another facility that he had a medical order stating that he had "double cuff only status," they ignored his claim and sought to handcuff him behind his back using a standard-length chain. Supp. Compl. ¶ 3 at 4, ECF No. 7. The Court denied Defendants' First Motion for Summary Judgment as to this claim because none of the parties had submitted a copy of the applicable handcuffing policy or any double cuffing orders applicable to Germain in 2015, and Defendants had not directly responded to the allegations regarding the handcuffing policy.

According to the records submitted with the briefing on the present Motion, Germain had received temporary medical orders authorizing handcuffing with his hands in front of his body, referred to as "front cuffing," because of his shoulder injury, for one-year periods beginning on

6

April 24, 2012 and July 24, 2012. Cuffing Orders at 4-6, ECF No. 103-5. In August 2012, NBCI Chief of Security Keith K. Arnold issued a memorandum ("the Arnold Memorandum") stating that he had been made aware that many inmates at NBCI had received medical waivers to allow "Front Handcuffing or Double Handcuffing in the Rear Medical Status," but that because NBCI is a maximum security prison, pursuant to a Department of Correction ("DOC") directive, inmates "shall be handcuffed behind the back at all times during escort and during such activities as hearings and interviews." Arnold Mem. at 1, ECF No. 103-3. He noted, however, that "[i]nmates may be handcuffed in the front, as determined by the warden or the shift commander, on a case by case basis" in certain situations "when it has been determined necessary by the medical provider." Id. (emphasis in original). He also stated that "[w]aivers for front handcuffing will be honored for escorts that will take the inmate out of the confines of their assigned housing unit for a prolonged duration." Id.

Following the adoption of this policy, Germain received orders allowing him to have "extended cuffing in the back" for the periods from January 3, 2014 to January 3, 2015 and from January 6, 2015 to January 6, 2016. Cuffing Orders at 1-3. On March 12, 2015, however, correctional staff asked Nurse Practitioner Clark to review whether Germain continued to need double cuffing. Although Clark noted that Germain had a "history of bilateral shoulder pain," she concluded in a medical treatment entry that "[f]or safety and security of the institution, [patient] may be cuffed as per custody." Med. Records at 36, ECF No. 98-5. During a July 7, 2015 medical visit, Clark observed that Germain was cuffed with single cuffs behind his back and was able to get on and off the exam table. During an investigation into Germain's later administrative remedy procedure grievance ("ARP") complaining that his prior medical handcuffing order had not been honored, another nurse, Adaora Odunze, concluded in October 2015 that Clark's March 12, 2015

7

notation "essentially overrides" the prior double cuffing order. Med. Records at 39, ECF No. 98-5. In December 2015, Germain filed a sick call request about severe pain he endured from single cuffing during a 50-minute transport to another institution. In December 2016, when he complained to a nurse during a sick call visit, the nurse told him that medical staff was "no long[e]r involved with cuff status." Med. Records at 3, ECF No. 103-10.

## DISCUSSION

In his Motion to Alter or Amend the Judgment, Germain seeks reconsideration of the Court's March 23, 2018 grant of summary judgment on his claim that Nurse Bilak violated his Eighth Amendment rights by discontinuing his prescription for Tramadol. He separately seeks appointment of counsel and leave to file a surreply to Defendants' Second Motion for Summary Judgment.

In support of the Second Motion for Summary Judgment, Defendants assert that the Court should grant summary judgment in their favor because they did not personally participate in any alleged wrongdoing, there is no evidence of deliberate indifference to Germain's medical needs, and they are entitled to qualified immunity.

### I. Germain's Motions

#### A. Motion to Alter or Amend the Judgment

Although Germain has filed a Motion to Alter or Amend the Judgment under Federal Rule of Civil Procedure 59(e), the Court has yet to enter final judgment in this case. His motion is therefore most appropriately construed as a motion for reconsideration under Rule 54. Under Rule 54, an interlocutory order "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Reconsideration under Rule 54(b) is at the sound discretion of the district court. *See Am. Canoe Ass'n, Inc. v.*

8

*Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003). Although the Rule 54(b) standard is not as exacting as the Rule 59 and 60 standard, *see Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1472 (4th Cir. 1991), revisiting earlier rulings is still "subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again,'" *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (quoting *Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944, 953 (2d Cir. 1964). Thus, a motion for reconsideration is "not the proper place to relitigate a case after the court has ruled against a party, as mere disagreement with a court's rulings will not support granting such a request." *Lynn v. Monarch Recovery Mgmt.*, 953 F. Supp. 2d 612, 620 (D. Md. 2013). Otherwise, "there would be no conclusion to motions practice, each motion becoming nothing more than the latest installment in a potentially endless serial that would exhaust the resources of the parties and the court." *Potter v. Potter*, 199 F.R.D. 550, 553 (D. Md. 2001).

Here, Germain identifies no compelling reason for the Court to alter its prior ruling. Rather, he disagrees with the Court's factual findings underlying its conclusion that an inadvertent gap in his Tramadol prescription was not the result of deliberate indifference to a serious medical need. The only new argument offered by Germain is that his medical records show that because his Tramadol prescription was stopped, he lost 17 pounds between February 20, 2017 and February 28, 2017, then lost an additional 22 pounds in two months because Bilak did not treat him for withdrawal symptoms. Germain's calculations, however, are not supported by the medical records. Although a record of a medical visit on February 20, 2017 lists his weight as 217 pounds, there is no weight listed on the record of his February 28, 2017 visit. Moreover, the 217-pound

notation is of questionable accuracy, because his measured weight on February 15, 2017, during a neurosurgery consultation only five days before, was recorded as 185 pounds.

Furthermore, Dr. Robustiano Barrera, the Medical Director of NBCI, stated in his affidavit that where Germain's Tramadol was discontinued on or about February 16, 2017, and narcotic withdrawal symptoms typically peak at 72 hours after cessation of the medication, such symptoms would have already peaked by February 28, 2017 and would have been "extraordinarily unlikely" to persist two months later, in April 2017. Barrera Aff. ¶14, ECF No. 35-5. Dr. Barrera also noted that on February 28, 2017, Germain's vital signs were normal, and the symptoms Germain described that day were "not consistent with having Tramadol withdrawal symptoms." *Id.* Finally, Dr. Barrera explained that at the time that his Tramadol prescription was stopped, Germain was taking Neurontin, which would ordinarily alleviate symptoms of opiate withdrawal. Under these circumstances, Germain's proffer of alleged weight loss does not provide a basis for the Court to alter its conclusion that Bilak did not act with deliberate indifference to a serious medical need. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (noting that actual knowledge of the risk of harm to a prisoner is required to establish deliberate indifference; *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998) (requiring more than negligence to establish deliberate indifference). Accordingly, Germain's Motion to Alter or Amend the Judgment will be denied.

### B. Motion for Appointment of Counsel

Germain has filed a Motion for Appointment Counsel and, in support of his motion, cites his poverty, imprisonment, the likelihood that a trial in this matter will involve conflicting testimony, and his view that he has a meritorious case. "The court may request an attorney to represent any person" proceeding *in forma pauperis* who is "unable to afford counsel." 28 U.S.C. § 1915(e)(1) (2012). In civil actions, the Court appoints counsel only in exceptional

circumstances. *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). In doing so, the Court considers "the type and complexity of the case," whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (citations omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989). Exceptional circumstances include a litigant who "is barely able to read or write," *id.* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008); *see also Altevogt v. Kirwan*, No. WDQ-11-1061, 2012 WL 135283, at *2 (D. Md. Jan. 13, 2012). Inherent in this analysis is that one's indigence is insufficient to establish exceptional circumstances.

Upon careful consideration of the pending motions and numerous previous filings by Germain in this and other cases, the Court finds that he has demonstrated the ability either to articulate the legal and factual basis of his claims himself or to secure meaningful assistance in doing so. Furthermore, no trial or evidentiary hearing has been scheduled for this case. Thus, no exceptional circumstances exist which would warrant the appointment of an attorney to represent Germain. The Motion for Appointment of Counsel will be denied.

### C.     Motion for Leave to File a Surreply

In opposing Defendants' Motion for Summary Judgment, Germain seeks to file a surreply to provide additional evidence in support of his claim that Warden Bishop is responsible for a handcuffing policy that bars front cuffing or double cuffing pursuant to medical waivers. The filing of surreply memoranda is expressly discouraged. *See* D. Md. Local R. 105.2(a). Germain has not explained why the proffered evidence could not have been provided with an earlier filing. Nevertheless, because Defendants have not opposed the Motion for Leave to File a Surreply, and

because there is no apparent prejudice to Defendants from such a filing, the Court will grant the Motion.

## II.     Motion for Summary Judgment

### A.     Legal Standards

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

When a moving party submits affidavits or other evidence for the Court's consideration on a motion to dismiss, the Court ordinarily may not consider such materials unless the motion is treated as one for summary judgment. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). The notice requirement has been satisfied by the title of the Motion and the Court's standard notice to self-represented

12

parties explaining summary judgment and Rule 56. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or submit an equivalent request, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002); *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 341 (D. Md. 2011). On the First Motion for Summary Judgment, Germain filed a Rule 56(d) affidavit, and the Court granted in part his request for discovery. Where the Court ordered the production of certain materials and Germain has not sought further discovery, the Court may construe Defendants' Motion as seeking summary judgment.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### B.    Supervisory Liability

Defendants argue that they are entitled to summary judgment because regardless of whether any constitutional violations occurred, they cannot be held responsible because they did

not personally engage in such violations. It is firmly established that the doctrine of vicarious liability, or *respondeat superior*, does not apply to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no *respondeat superior* liability under § 1983); *cf. Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (holding that there is no *respondeat superior* liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 therefore must be supported by evidence that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Defendants Bishop and Liller assert that neither of them personally participated in the alleged constitutional violations. Liller, the Chief of Psychology at NBCI, had no direct responsibility for treating Germain. Although Germain wrote directly to him on April 9, 2015 requesting an assessment as to whether he should be assigned to the SNU, Germain was then seen by Beitzel on April 22, 2015. Where there was a prompt response after Liller was informed of Germain's complaint, Liller does not have personal liability or supervisory liability relating to the mental health treatment following the March 4, 2015 incident.

As for Warden Bishop, he was Warden of NBCI from February 2014 to December 2014, and again from April 2015 to the present. He thus was not the Warden at the time that the Arnold Memorandum was issued in August 2012, nor was he the Warden in March 2015, when Germain's double cuffing medical order was rescinded. There is no evidence that he was involved in that decision or any other decision that impacted Germain's double cuffing order, and there is no evidence that he participated in the May 26, 2015 incident when Germain was single cuffed, or any other similar decision. Although Germain submitted an ARP regarding the May 26, 2015 incident, the Warden's response came from an Acting Assistant Warden, not Warden Bishop. When Germain submitted a second ARP in August 2015 relating to his request for front cuffing or double cuffing, Captain Robinson, not Warden Bishop, reviewed that ARP and directed Germain to resubmit it with a copy of his prior medical order. There is no evidence that Germain resubmitted that ARP. In any event, the ARP was not ignored; an investigation was conducted into whether Germain had a double cuffing order and whether it had been rescinded. Finally, Warden Bishop did not sign the ARP of another inmate submitted by Germain with his surreply brief. Because Warden Bishop had no personal involvement in the handcuffing policy or decisions regarding how to handcuff Germain, he is entitled to summary judgment on the handcuffing claim.

Nevertheless, the Court will examine the merits of both of Germain's claims to determine if Germain failed to name the proper parties for otherwise meritorious claims.

### C.    Mental Health Treatment

Germain claims that Defendants violated the Eighth Amendment by providing inadequate mental health treatment following the March 4, 2015 incident. The Eighth Amendment's guarantee against cruel and unusual punishment prohibits "unnecessary and wanton infliction of pain" upon a prisoner. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see Hope v. Pelzer*, 536 U.S.

730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 219 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

The Eighth Amendment can be violated by a denial of medical care if the defendant's actions, or failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Anderson*, 877 F.3d at 543. Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison personnel actually knew of and disregarded an excessive risk to the inmate's health and thus failed either to provide medical care or to ensure that it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-11 (4th Cir. 2017); *Iko*, 535 F.3d at 241. Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. Mere negligence or malpractice does not rise to the level of a constitutional violation. *See Estelle*, 429 U.S. at 106. "Deliberate indifference" requires that a prison official actually "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *De'Lonta*, 330 F.3d at 634 (stating that deliberate indifference requires "that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm"). "Actual knowledge or awareness" on the part of prison staff is essential to an Eighth Amendment claim for denial of medical care, because prison officials who lacked knowledge of a medical risk cannot be

said to have inflicted cruel and unusual punishment by withholding treatment. *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (citing *Farmer*, 511 U.S. at 844).

There is "no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart." *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (stating that "[c]ourts treat an inmate's mental health claims just as seriously as any physical health claims"). A prisoner is entitled to "psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Bowring*, 551 F.2d at 47. The right to mental health treatment is based upon the essential test of medical necessity, not whether the care merely desirable. *Id.* at 48.

Based on the sequence of events described above, the Court concludes that following the March 4, 2015 incident, Germain received regular mental health treatment for his ongoing anxiety and depression, including periodic visits at which he was evaluated and his medication was adjusted. Specifically, he saw mental health providers on March 13, 2015; April 22, 2015; May 8, 2015; June 9, 2015; June 17, 2015; September 16, 2015; and December 15, 2015. Two potential shortcomings appear in this treatment history. First, following the March 13, 2015 visit with Holwager that was interrupted by a correctional officer, Germain's multiple written requests for mental health treatment did not result in another mental health visit until his evaluation by Beitzel on April 22, 2015. Although this gap in time was inappropriate, the record does not support a finding of deliberate indifference. In particular, there is no evidence that Defendants, or any of the

NBCI mental health care providers, deliberately avoided providing treatment to Germain. Germain attributes the lack of treatment by Holwager on March 13 to an interruption by a correctional officer but acknowledged that Holwager appeared to want to assist him. Although she did not respond to Germain's follow-up inquiries, there is no basis to conclude that she consciously chose to ignore Germain. Moreover, there is no record establishing that Liller actually reviewed the April 9 letter sent to him by Germain, and even if he did, the evaluation by Beitzel occurred on April 22, less than two weeks later, and just one day after Dr. Ashraf told Germain that he would ask Liller to arrange for mental health care. From that point forward, the evaluations and medical treatment were more regular.

Second, Germain argues that he was never provided with mental health care that focused on addressing the trauma he experienced as a result of the March 4, 2015 alleged assault by correctional officers with a chemical agent. He claims that his well-established history of depression and anxiety began when he was sexually assaulted by another inmate and that his symptoms were exacerbated by the March 4, 2015 incident. However, when Beitzel inquired of the social worker assigned to Germain's housing unit about Germain's sexual assault allegation, she was advised that the claim had been investigated and dropped due to a lack of evidence. Indeed, the Intelligence and Investigative Division ("IID") conducted an investigation, concluded that Germain could not provide "any tangible evidence that supported his allegation," and recommended on April 6, 2015 that Germain's PREA claim be dismissed. *See Germain v. Gilpin*, No. TDC-18-0846, IID Report at 4 (ECF No. 10-7).

In any event, the mental health treatment records reveal that Mull, Beitzel, and Dr. Siracusano did not observe in Germain symptoms that raised concerns beyond those that could be addressed through Germain's ongoing medication. Although Germain sought a different course

18

of treatment, a disagreement with a healthcare provider over the particular type of treatment does not establish deliberate indifference. *See United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011). Where the mental healthcare providers evaluated Germain, found his claims to be either exaggerated or based on his longstanding fears regarding double celling, and determined that the appropriate treatment was continued medication for anxiety and depression, any inadequacies in treatment would have been, at worst, based on negligence. *See Scinto*, 841 F.3d at 225 (stating that deliberate indifference "is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result"). Where the NBCI mental healthcare providers regularly saw Germain, adjusted his medication, and had no reason to callously disregard his mental health issues, the record does not support a finding of deliberate indifference to a serious medical need. *Farmer*, 511 U.S. at 834-37.

Finally, there is no evidence that either Warden Bishop or Liller was actually aware that Germain had a mental health condition arising from the alleged assault that created a substantial risk of harm and failed to act to address it. *See Johnson*, 145 F.3d at 168 (finding that actual knowledge of a serious medical condition, not just symptoms of such a condition, are required for an Eighth Amendment claim). Defendants are entitled to summary judgment on this claim.

### D.     Handcuffing Policy

Germain also claims that Defendants violated the Eighth Amendment when he was handcuffed with his hands behind his back without a longer, double handcuff, in violation of a standing medical order and in deliberate indifference to the serious medical need of a shoulder injury that caused him pain when handcuffed in the standard way. The specific incident of allegedly improper handcuffing occurred on May 26, 2015, when Germain was scheduled to be transported to a dental appointment and the escorting officer, Officer Dorcon, attempted to

handcuff him with a single pair of handcuffs. When Germain refused to be handcuffed in the manner Dorcon attempted, Dorcon left Germain in his cell and did not escort him to the appointment. In denying the First Motion for Summary Judgment, the Court noted that prior handcuffing orders, general to NBCI and specific to Germain, were not part of the record and ordered their production and submission.

As discussed above, the newly submitted records reveal that the most recent NBCI policy relating to handcuffing derived from a memorandum issued in August 2012 by NBCI Chief of Security Arnold, who noted that while many inmates at NBCI had received medical waivers to allow "Front Handcuffing or Double Handcuffing in the Rear Medical Status," inmates generally needed to be handcuffed from behind pursuant to DOC policy and because NBCI is a maximum security prison. Arnold Mem. at 1, ECF No. 103-3. The Arnold Memorandum allowed handcuffing in the front "as determined by the warden or the shift commander, on a case by case basis" in situations "when it has been determined necessary by the medical provider." *Id.*

Following the issuance of this policy, Germain received a series of temporary medical orders authorizing "extended cuffing in the back" because of his shoulder injury, with the most recent order issued on January 5, 2015 to be effective through January 5, 2016. On March 12, 2015, however, correctional staff asked Clark to review whether Germain continued to need double cuffing. Although Clark noted that Germain had a "history of bilateral shoulder pain," she concluded that Germain could be handcuffed "as per custody." NBCI Records at 36, ECF No. 98-5.

Based on this record, the Court concludes that at the time of the May 26, 2015 handcuffing incident, Germain did not have an active medical order requiring front cuffing or double cuffing. There is no evidence that Germain produced to the correctional officer the overridden January

2015 medical order at the time of that incident. The Court therefore cannot find a constitutional violation on the part of correctional staff arising from the May 26, 2015 incident or later incidents referenced by Germain where there was no valid medical order in place to inform correctional staff of a need for front cuffing or double cuffing.

Indeed, the later incidents after May 26, 2015 not referenced in the Complaint are not properly before the Court, including Germain's claim that there were times when he was on disciplinary segregation where he was left single cuffed behind his back for up to an hour and his allegations regarding pain he endured from single cuffing during a 50-minute transport to another institution in December 2015. *See Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) (holding that a "plaintiff may not amend a complaint through argument in a brief opposing summary judgment" and citing to published opinions from four other circuits).

More broadly, Germain argues that the Arnold Memorandum violates the Eighth Amendment because it placed handcuffing decisions solely in the hands of correctional staff and bars medical staff from issuing orders requiring alternative handcuffing procedures based on medical necessity. A fair reading of the Arnold Memorandum, however, does not support that conclusion. First, after its issuance in August 2012, Germain continued to receive one-year medical waivers allowing double cuffing, which was not barred by the policy, until March 2015. Furthermore, although the policy appears to disfavor indefinite or lengthy medical waivers, it explicitly permits "case by case basis" determinations by the prison to allow front handcuffing in situations "when it has been determined necessary by the medical provider." Arnold Mem. at 1, ECF No. 103-3. According to Clark, as of 2015, because of security concerns that certain inmates were slipping out of their handcuffs, the NBCI medical providers had determined that any

necessary double cuffing would be limited to 30-day orders and that they would seek to avoid such orders for security reasons. But there was no overall bar on handcuffing waivers. *See Pevia v. Stouffer*, No. ELH-13-2905, 2015 WL 424717, at *12 (D. Md. Jan. 29, 2015) (noting that the Arnold Memorandum allowed front cuffing in cases of "obviously serious medical conditions"). Germain has identified no Eighth Amendment requirement that medical waivers be open-ended or last for a particular period of time. Where medical necessity can still provide a basis for a waiver, Germain has not established that the Arnold Memorandum itself is unconstitutional.

As for the claim that correctional staff rescinded his medical waiver unilaterally, the record reflects that Clark reviewed Germain's status, including his ongoing shoulder injury, and determined in March 2015 that despite that injury, alternative handcuffing was no longer medically necessary. Notably, Clark observed Germain again in July 2015 and saw that he was able to get on and off the exam table while handcuffed. Thus, the determination on whether to require alternative handcuffing involved consultation with a medical provider who was familiar with Germain's medical condition. Although Germain may disagree with Clark's conclusion, a disagreement with a medical provider is insufficient to support a deliberate indifference claim. *Jackson*, 775 F.3d at 178-79. Indeed, even if Clark's determination that double cuffing was not medically necessary was an incorrect determination, such an error would not support an Eighth Amendment claim. *See id.* (holding that a non-cardiologist's erroneous diagnosis of a serious heart condition was "insufficient to clear the high bar of a constitutional claim").

Finally, the Court reiterates that beyond this conclusion, there is no evidence that Warden Bishop was aware of, or participated in, handcuffing decisions relating to Germain. He is therefore entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, Germain's Motion to Alter or Amend the Judgment and Motion for Appointment of Counsel will be denied, Germain's Motion for Leave to File a Surreply will be granted as unopposed, and Defendants' Second Motion for Summary Judgment and Motion to Seal will be granted. A separate Order shall issue.

Date: March 12, 2019

THEODORE D. CHUANG
United States District Judge